Of Counsel:
CLAY CHAPMAN CRUMPTON IWAMURA & PULICE

ROBERT E. CHAPMAN     #2679
rchapman@paclawteam.com
MARY MARTIN     #5475
mmartin@paclawteam.com
Topa Tower, Suite 2100
700 Bishop Street
Honolulu, Hawaii 96813
Telephone:  (808) 535-8400
Facsimile:  (808) 535-8444

Attorneys for Defendant
Robert Alan Jones

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CAROL J. NELSON, | CIVIL NO. 01-182 KSC |
| Plaintiff, | |
| vs. | DEFENDANT'S **CLOSING ARGUMENT;** CERTIFICATE OF SERVICE |
| ROBERT ALAN JONES, | |
| Defendants, | |
| ROBERT ALAN JONES, | BENCH TRIAL: August 7, 2007 |
| Counterclaimant, | |
| vs. | |
| CAROL J. NELSON, MICHAEL CETRARO, | |
| Counterclaim Defendants. | |

**DEFENDANT'S CLOSING ARGUMENT**

COMES NOW Defendant-Counterclaimant, by and through his attorneys, Clay Chapman Crumpton Iwamura & Pulice, and submits his Closing Argument, pursuant to the court's instructions.

This trial commenced as a result of the remand from the Ninth Circuit Court of Appeals, whose findings are the law of the case. The Ninth Circuit opinion was premised on the representation that there was, indeed, an Agreement of Sale ("AOS") for the condominium to Bilanzich, and that Bilanzich subsequently assigned his interest to Jones. The Ninth Circuit found that the AOS "does not clearly and unequivocally condition the sale of the condominium on the successful completion of the Licensing Agreement." Further, the Court found that there was a material factual question as to whether Jones could suspend performance while waiting for assurance of performance - as permitted under Hawaii law.

The evidence was consistent with the Ninth Circuit Opinion which assumed the AOS was valid. Cetraro, who was the creator of Exhibit D-8, testified that D-8 was the summary of the AOS negotiations, and that the document identified as P-1 was an evolving

document, created over the course of a week, compiled at different times on different days. He stated that the fifth page, including amortization tables (D-8), summarizes the terms agreed to, and that the other pages of P-1 were speculative.

The parties acted consistent with the terms of the AOS. First, the five licenses and trade credits (D-2 and D-4) were granted immediately on execution of the AOS. This consideration was received by the sellers, Nelson and Cetraro (her partner), immediately at the time of execution of the AOS. At the same time, Cetraro was granted authority to sell additional licensing agreements within the state of Montana. D-4. Bilanzich made some payments on the monetary portion of the consideration, although he owed about $7,000 when he assigned the AOS to Jones. Jones made the sellers whole as to that deficiency.

This court has asked that four certain points be addressed, within a ten-page written closing.

1. **Assuming a valid AOS, was the assignment by Bilanzich to Jones valid?**

Yes, the assignment was valid. The Bill of Sale and Assignment to Jones were received in evidence. (D-1 and D-5). Nothing in the AOS precluded Bilanzich

2

from assigning it.  It was freely transferable; no one questioned the fact that he assigned it.  Both parties acted consistently with the validity of the assignment.

Jones paid the monthly billings, although his medical issues affected absolute timeliness.  However, he honored Bilanzich' obligation, and paid the past due $7,000.00 amount.  The check (D-13, 1st page), included the notation "additional escrow deposit" when presented.  Jones delivered the check to Lovell, with his letter expressing his desire to close the deal (P-17), and Lovell presented the check to Cetraro, who eventually cashed it.  Nelson admitted that she was aware of that check, and that it was deposited in their Montana account.

Effective with the assignment of the AOS, Nelson immediately began sending the monthly invoices to Jones, billing him on the exact same formula at which Bilanzich had been billed, including the payment on the AOS at $629.81 per month.  Nelson and Cetraro are therefore estopped from denying that the assignment to Jones was valid — it is the only basis on which they could accept that payment from Jones.[1]

---

[1] Nelson has pending in the Third Circuit Court, State of Hawaii, an action entitled Nelson v. Jones, Civ. 06-1-181K, in

3

### 2. Was there an oral modification to the AOS when Alan Jones assumed Bilanzich' interest?

There was no oral modification to the AOS when Jones assumed Bilanzich' position. Any argument that it was converted to a lease, or rental agreement, is belied by the actions of the parties. First, Nelson immediately changed her invoicing to Jones, in a manner identical to that used with Bilanzich. Second, she invoiced on the same basis that she did with Bilanzich, including the exact amount due pursuant to the amortization schedule on the AOS. Third, Nelson and Cetraro accepted Jones' check to cover Bilanzich' arrearage, which check indicated it was 'additional escrow deposit'. Finally, even in filing the complaint which initiated this legal proceeding, Nelson's counsel did not file a summary possession action in the District Court, State of Hawaii, which court has exclusive jurisdiction over landlord-tenant summary possession matters. Instead, Nelson's counsel filed in the Circuit Court, seeking declaratory relief as to

---

which she seeks additional payments from Jones for use of the same condo property. In the Complaint, she alleges that she agreed to sell the condo to Bilanzich, and that Bilanzich assigned all of his rights to Jones. The court is asked to take judicial notice of those pleadings insofar as there is any question that there was an agreement and it was validly assigned to Jones. A copy of that Complaint can be made available to this court on request.

4

title to the property.  The only reason to bring the suit in Circuit Court is because Circuit Court has jurisdiction over title disputes.  If the AOS had been modified to a lease, especially if there were any writing to demonstrate that argument (but there was not), then Nelson's action would not have been brought in the Circuit Court; it would have been filed in the District Court which has exclusive jurisdiction over landlord-tenant summary possession actions.

   3.  **What was the legal significance, if any, of BACC in Montana and $20,000 trade credits promised to Nelson/Cetraro, with respect to performance of the AOS?**

The Ninth Circuit has already spoken on whether the Agreement was "conditioned" on successful completion of the Licensing Agreement, including the trade credits.[2]  The Ninth Circuit stated as follows:

> To the extent the district court concluded that the Agreement of Sale was invalid due to a failure of consideration or condition precedent, **it erred because the Agreement does not clearly and unequivocally condition the sale** of the condominium on the successful completion of the Licensing Agreement.

In making that ruling, the court cited Hawaii law for the premise that if a contract is contingent on the

---

[2] The execution of the Licensing Agreement is not questioned; the Court alluded to whether the fact that the licensor eventually filed bankruptcy affected the Agreement of Sale.

5

successful completion of a specific term, then the contract must specifically state the contingency.  As found by the Ninth Circuit, the subject AOS did not include any condition of success as to the use of the licenses for the state of Montana.

As such a finding by an appellate court is the law of the case, so it is here.  See <u>Ditto v. McCurdy</u>, 98 Haw. 123, 128, 44 P.3d 274, 279 (2002).  Further, the testimony of Cetraro was that there were BACC stores opened in Montana pursuant to the License Agreement, and that credits were received.  He also testified that according to the License Agreement with the credits, he could have waited until the tenth year to exercise his right to open BACC stores, but that Jones, or Bilanzich, could have completed the condo conveyance once the principal balance due was paid.  Based on those admissions, it would be inconsistent to argue that closing the sale and conveyance of the condo — which was contemplated as early as 1999 – was contingent on the success of Montana stores which Cetraro and Nelson might not have attempted to open until several years later, if ever.

Further, after receipt of the licenses, valued individually at $15,000-$25,000 at that time, Nelson

6

and Cetraro were free to sell those licenses if they wished.  They did open two stores, and continued to operate those stores through the Fall of 2000, more than 3-1/2 years following the trade in equity of the condo for the licenses (their lawyer opined in 1999 that the licenses were valid).  The bottom line is that the transfer of the consideration was complete upon execution of the AOS – despite the shelf life of 10 years for the licenses – and Nelson and Cetraro were in control of when they would be implemented.  The purchaser of the condo had no control over when Nelson and Cetraro initiated use of the licenses in Montana.

It is Jones' position that the "success" or "satisfaction" of the trade credit promise worth $20,000 was not a contingency of the AOS; in fact, those trade credits could have been completely exhausted before the AOS was even assigned to Jones – given Cetraro's testimony that his understanding was that he could draw up to $3,000 per month on that credit.  He testified that he had actually expected to use it in 1-1/2 to 2 years.

There was contradictory evidence as to whether the full $20,000 of trade credits was honored.  To the extent that Cetraro was having difficulty with

and Cetraro were free to sell those licenses if they wished.  They did open two stores, and continued to operate those stores through the Fall of 2000, more than 3-1/2 years following the trade in equity of the condo for the licenses (their lawyer opined in 1999 that the licenses were valid).  The bottom line is that the transfer of the consideration was complete upon execution of the AOS – despite the shelf life of 10 years for the licenses – and Nelson and Cetraro were in control of when they would be implemented.  The purchaser of the condo had no control over when Nelson and Cetraro initiated use of the licenses in Montana.

It is Jones' position that the "success" or "satisfaction" of the trade credit promise worth $20,000 was not a contingency of the AOS; in fact, those trade credits could have been completely exhausted before the AOS was even assigned to Jones – given Cetraro's testimony that his understanding was that he could draw up to $3,000 per month on that credit.  He testified that he had actually expected to use it in 1-1/2 to 2 years.

There was contradictory evidence as to whether the full $20,000 of trade credits was honored.  To the extent that Cetraro was having difficulty with

obtaining product, Jones agreed to supply merchandise and coffee for any deficit.  In the long run, given that the trade credits were for a specific amount, and were it a contingency, and had they not been fully honored, the purchase price could have simply been adjusted, as would be appropriate in any action in equity, as is the instant case.  The burden of proof as to whether the trade credits were received is on the Plaintiff who presented no documentary evidence on this point.

    **4.   As to the affirmative claims of the opposing party, discuss defenses as to each claim.**

    Plaintiff's remaining claims are her Count I, for summary possession, and Count III, for declaratory relief.  Clearly, the summary possession issue is moot, as the property was sold to a third party.  The declaratory relief is the counter to Defendant's case.  Specifically, Count III of Plaintiff's Complaint sought "a declaration that Defendant holds no interest in the Subject Property; that Plaintiff is now, and has been, the owner of the Subject Property in fee and exclusive possession..."

    As a result of the summary judgment ruling, which was later reversed, Plaintiff gained that

possession, but the issue of an interest in the Subject Property, which was referred to at trial as the Condo, was clearly shown to be in the hands of the person holding the AOS. Originally, it was Bilanzich, who then assigned his interest to Jones.

Jones' defenses to Nelson's claim for declaratory relief include, in addition to the discussion above concerning estoppel, that she has unclean hands to make such a claim, given her refusal to deal with Jones - first by directing him to deal with Cetraro, and then directing him to deal with her attorney, and never responding to his request to discuss closing the deal. Instead she filed the instant litigation, which would result in her gaining possession of the unit – which by that time had increased significantly in value over the amount at which it was valued for purposes of the AOS.

Finally, Nelson's action in continuing to bill Jones in a manner identical to that in which she billed Bilanzich, coupled with the action of Cetraro, in accepting and cashing Jones' check for $7,000.00 on behalf of Bilanzich, are actions which demonstrate fraud in the inducement, as they induced Jones to continue making the payments, as they knew the value of

9

the condo was increasing, and only took action to cancel the AOS when Jones sought completion of the contract and conveyance of title to the property.

Specifically, Nelson initiated that Complaint (on February 13, 2001), after Jones had several times attempted, in writing, to initiate discussions on the transfer of title.  See D-20, D-21, and D-26.  Interestingly, the Complaint made no mention of the Agreement of Sale, but more curiously, it did not make any allegation that any funds were due.  In short, it was the definitive anticipatory repudiation of a contract, and fully justified suspended performance by Jones.

It was Nelson who breached the contract, causing substantial economic damages to Jones.

DATED:  Honolulu, Hawaii, August 20, 2007.

                                                __/s/ Mary Martin_____
                                                ROBERT E. CHAPMAN
                                                MARY MARTIN
                                                Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CAROL J. NELSON, | ) CIVIL NO. 01-0182 KSC |
| Plaintiff, | ) |
| vs. | ) CERTIFICATE OF SERVICE |
| ROBERT ALAN JONES, | ) |
| Defendants, | ) |
| ROBERT ALAN JONES, | ) |
| Counterclaimant, | ) |
| vs. | ) |
| CAROL J. NELSON, MICHAEL CETRARO, | ) |
| Counterclaim Defendants. | ) |

**CERTIFICATE OF SERVICE**

It is hereby certified that on the dates and by the methods of service noted below, a true and correct copy of the foregoing document was duly served on the following parties at their last known addresses:

Served electronically through CM/ECF: August 20, 2007.

11

Enver.painter@hawaiiantel.net
ENVER W. PAINTER, Jr., Esq.

DATED:  Honolulu, Hawaii, August 20, 2007

                                                                              /s/ Mary Martin
ROBERT E. CHAPMAN
MARY MARTIN
Attorneys for
Defendant/Counterclaimant
ROBERT ALAN JONES

304980.1