ORIGINAL

ENVER W. PAINTER, JR.   2525
Attorney at Law
1188 Bishop Street, Suite 2505
Honolulu, Hawaii 96813
Telephone: (808) 537-9777

Attorney for Plaintiff and
   Counterclaim/Defendant
   Carol J. Nelson

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 3 0 2007

at 3 o'clock and 00 min P M
SUE BEITIA, CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CAROL J. NELSON, | CV 01-00182 KSC |
| Plaintiff, | |
| vs. | |
| ROBERT ALAN JONES | PLAINTIFF'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW and CERTIFICATE OF SERVICE |
| Defendant. | |
| ROBERT ALAN JONES | |
| Counterclaimant, | Bench Trial August 7, 2007 |
| vs. | Magistrate Judge Kevin S. S. Chang |
| CAROL NELSON | |
| Counterclaim Defendant. | |

## PLAINTIFF'S AMENDED PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, CAROL J. NELSON (Nelson) by and through her undersigned attorney, hereby submit these Amended Proposed Findings of Fact and Conclusion of Law  pursuant to the Court's instructions at the conclusion of the trial in this matter on August 9, 2007.

### PLAINTIFF'S AMENDED PROPOSED FINDINGS OF FACT

This matter came on for bench trial on August 7,  8 and 9, 2007 before the Honorable Kevin S. S. Chang, Magistrate Judge of the above entitled Court by consent of the parties. The Court, having heard and considered all the evidence presented and testimony adduced at the trial in this case, and having observed the demeanor of the witnesses, and having evaluated their credibility and candor, finds the facts of this case to be as follows.  If it should later be determined that any of these findings of fact should be properly deemed conclusions of law, the Court so concludes on those legal issues.

1.    The subject of this lawsuit is a residential condominium unit located at 75-5719 Ali'i Drive in Kailua-Kona, Hawaii ("Condo')

2.    Title to the Condo was, at all times relevant, vested solely in Plaintiff/Counterclaim Defendant, Carol J. Nelson, ("Nelson")

3.    While visiting on the big island of Hawaii in February or March

of 1997, Michael Cetraro ("Cetraro") stopped into a coffee shop called Bad Ass Coffee Company in Kailua-Kona. In that shop, Cetraro had a conversation with an individual by the name of Dennis Lovell ("Lovell") regarding Cetraro operating Bad Ass Coffee Company ("BACC") stores in the state of Montana. Cetraro had further discussion with Lovell and with Mike Bilanzich (Bilanzich) who lived in Utah and who Cetraro understood to be the principal of a company in Utah which owned the Bad Ass Coffee Company trade name.

4.     During these discussions Bilanzich learned that Nelson owned Unit No. 406 in the Kona Plaza condominium in Kailua-Kona (Condo). Bilanzich stated that he was in immediate need of a condo in Kona to house BACC employees and that he or one of his BACC related entitles might be interested in purchasing Nelson's Condo. Bilanzich however wanted immediate use of the Condo pending any anticipated purchase.

5.     Bilanzich  stated that he would be willing to give licenses for BACC store in Montana as part consideration for the purchase of the Condo. Nelson agreed to allow him to use the Condo in the interim period so long as he paid all of the costs associated with the Condo.

6.     Cetraro, Bilanzich and Lovell continued discussion of various scenarios regarding  licenses to operate BACC stores in Montana, the possible sale

of the Condo to Bilanzich or one of his entities and Bilanzich's use of the Condo

pending his decision as to whether he wanted to purchase the Condo.

7.    So that everyone understood what was contemplated, Cetraro

drafted a Letter of Intent setting forth various scenarios for the purchase of the

Condo consisting of different combinations of license and coffee credits and cash

based upon future hypothetical events. (P1) Page 5 of the Letter of Intent was

intended to be a summary or compilation of terms that had been agreed to and

terms yet to be negotiated or as Cetraro described them "points of light."

8.    These discussions resulted in Nelson and Cetraro signing of a

License Agreement on April 29, 1997. (P3)

9.    Although the Licenses Agreement was dated April 23, 1997

and effective April 28, 1997, Nelson and Cetraro testified that they signed the

License Agreement on April 29, 1997 at the same time Nelson and Lovell signed

Letter of Intent regarding the possible future purchase of Nelson's Condo.

10.    It is unclear when Bilanzich signed the License Agreement on

behalf of the licensor, BACC USA. Nelson and/or Cetraro however did not

receive a copy of the License Agreement signed by Bilanzich until September of

2000 during Cetraro's deposition taken in an action filed in the United States

District Court in Utah by BACC of Hawaii, a Utah corporation, to enjoin Nelson

and Cetraro from using the BACC trade name. (D2)

11.    The parties to the License Agreement were BACC USA as licensor and Nelson and Cetraro as licensees.  The License Agreement was intended to give Nelson and Cetraro the right to use the trade name, Bad Ass Coffee Company at five (5) to be determined locations in Montana for a period of ten (10) years.  No price for the five (5) Montana licensees was set forth in the License Agreement.

12.    Although the License Agreement did not mention the Condo, Nelson, Cetraro, Bilanzich and Lovell understood that any future purchase of Nelson's Condo was conditioned upon Nelson and Cetraro having the right to operate five (5) Bad Ass Coffee Company retail stores in Montana for a period of ten (10) years, the negotiation and receipt of credits for the purchase of coffee and other BACC logo products and that the balance of the purchase price was to be evidenced by a promissory note and secured by a second mortgage.  Nelson understood that any sale of the Condo was subject to the negotiation and signing of a Deposit Receipt Offer and Acceptance real estate contract ("DROA") or other form of a contract for the purchase of the Condo and agreement as to when the balance of the purchase price would be paid.

13.    Nelson understood that if Bilanzich was going to purchase the

Condo, the transaction would be consummated by the time the balloon payment on the existing mortgage became due on November 30, 1999

14.    The parties understood that the purchase price for the Condo would be $135,000 and would be paid through a combination of licensees for the rights to operate BACC stores in Montana, trade credits for purchase of BACC logo coffee and merchandise and that any balance was to be evidenced by a note, secured by a mortgage and paid in full by November 30, 1999, the date that the balloon payment on Nelson's existing mortgage became due.

15.    Nelson understood that if the sale of the Condo was to go forward, Cetraro and Bilanzich would negotiate all remaining terms which would then be included in a formal written contract and provided to her for her review and approval.

16.    It was understood that only Nelson could approve and agree to any proposed terms and conditions regarding any future sale of the Condo. Cetraro was negotiating with Lovell and Bilanzich regarding the licensees for the BACC stores in Montana and the possible terms for the purchase of the Condo, but the Condo was Nelson's property and any proposed contract for the sale of the Condo to Bilanzich or one of his entities required Nelson's approval and signature.

17.     Cetraro attempted to list the understandings of the parties on page 5 of the Letter of Intent which was signed by Nelson and Lovell for "M.B." on April 29, 1997. (P2, D8)

18.     The first item listed on page 5 of the Letter of intent was $90,000 which represented the difference between the sales price of $135,000 and a $45,000 credit for licenses to operate five (5) BACC stores in Montana. Cetraro then listed the tax assessed value of the Condo. Following the taxed assessed value, Cetraro listed the terms, contingencies and conditions that had been discussed.

19.     The first term, contingency and/or condition listed was the date by which Bilanzich would be responsible for the payments for the purchase of the condo if he chose to purchase it. Cetraro and Nelson testified that the dates were left blank because as of April 29, 1997 Bilanzich had not yet decided whether he wanted to purchase the Condo or not. Bilanzich decision regarding his possible purchase of the Condo was dependent upon whether Nelson's underlying mortgage contained a due on sales clause. If it did and the mortgagee did not waive the due on sale clause, Bilanzich might not want to purchase the Condo.

20.     Cetraro subsequently confirmed that Nelson's underlying mortgage did in fact contain a due on sales clause. Whether the holder of that

mortgage would waive the due on sales clause should Bilanzich want to purchase the Condo was never determined.

21.    The second term, contingency and/or condition listed memorialized Nelson's understanding that if Bilanzich wanted to purchase the Condo he and Cetraro would negotiate any remaining terms and that Bilanzich's counsel would draft a DROA or other form of a contract for the purchase and give it to Nelson her for her review and approval and/or the review and approval of legal counsel. Nelson would continue to pay AOAA fees, utilities, insurance, taxes etc associated with the Condo until a formal contract for the purchase and sale of the Condo had been negotiated and executed. No further DROA, writing or contract for the future purchase and sale of the Condo was ever negotiated, drafted or executed by Nelson and Bilanzich and Nelson continued to pay the AOAA fees, utilities, insurance taxes etc .

22.    The third term, contingency and/or condition listed provided for "co tenancy" until the above described "paperwork" was done. Neither Nelson, Cetraro or Lovell seemed to have an understanding as to what this particular provision meant or was intened to mean.

23.    The fourth third term, contingency and/or condition listed memorialized an understanding that the date by which Bilanzich's balloon

payment was to be due was to be discussed and negotiated, and that once that date had been determined, a note was to be signed and Bilanzich would then be given title to the Condo.

24.     The fifth term, contingency and/or condition listed was Nelson's understanding that if the holder of the underlying first mortgage, Rodney and Mary Ann Burgett waived the due on sales clause contained in their first mortgage against the property, Nelson would maintain both the Burgett's first mortgage and a second mortgage from Bilanzich securing the note to be signed for whatever the remaining purchase price was determined to be.

25.     The sixth term, contingency and/or condition listed and a subsequent notation "quit claims with signed note" dealt with Nelson and Bilanzich signing quit claim deed in favor of each other depending upon whether Bilanzich decided to purchase the Condo or not. Cetraro testified that he did not remember which reference to quit claim deeds dealt with what contingency but that one was intended to secure Bilanzich performance of the license agreement if Bilanzich subsequently chose to purchase the Condo and the other was to secure Cetraro's payment of the $45,000 licensee fee if Bilanzich did not purchase the Condo. This seems to be born out by Bilanzich's Affidavit attached to Jones Second Amended Counterclaim (P20) filed herein wherein Bilanzich states at

-8-

paragraph 4 "As part of the Licensees' consideration for the April 1997 License Agreement with Royal Aloha, Licensees were to transfer as collateral a portion of their interest in a condominium in Kona, Hawaii."

26.     The seventh term, contingency and/or condition listed was a $90,000 selling price. The "selling price" was understood by all parties to be $135,000. Cetraro testified that Bilanzich wanted the selling price listed in the Letter of Intent to be $90,0000 because he did not want to show any income from the sale of the licensees for the five (5) BACC stores in Montana until he either purchased the Condo or, if he didn't purchase, until Cetraro paid the $45,000 license fee.

27.     Cetraro then set out various financial terms for the note to be executed should Bilanzich decide to purchase the Condo. The note amount was to be $70,000 at 9% interest with a balloon payment due November 30, 1999 the date that Nelson's balloon payment to the Burgetts became due if the Burgetts would waive their due on sales clause, or May 5, 2007 if the Burgetts would waive their due on sales clause and agree to extend the date of Nelson's balloon payment due on their underlying mortgage through May 1, 2007. The amount of the note of $70,000 was conditioned upon Nelson and Cetraro receiving the rights to operate five (5) BACC stores in Montana for a period of ten years, i.e. through

May 1, 2007 and credits for the purchase of inventory for those stores in the amont

of $20,000.

28.     Following the financial details described in the proceeding

Finding of Fact, Cetraro set forth the expenses which Bilanzich was to pay for his

use of the Condo pending his decision as to whether he would purchase the

Condo. These expenses included utilities, maintenance fee due the AAOA, taxes

and a monthly payment based upon $70,000 at 9% interest amortized over 240

months with a balloon due in 10 years, i.e. May 1, 2007. Cetraro and Nelson

testified that payments for the use of the Condo were determined in this manner

because Bilanzich had requested, and Nelson had agreed, that if Bilanzich chose to

purchase the Condo the payments he made for the interim use of the Condo would

be credited against the purchase price. As Bilanzich's decision as to whether he

would in fact purchase the Condo was anticipated within a few months, Nelson

agreed to these payments for the interim use of the Condo even though her then

tenant was paying $1500 in rent, an amount exceeding the "rent" to be paid by

Bilanzich for his use of the Condo by severl hundred dollars per month.

29.     Following the itemization of expenses which Bilanzich was

to pay Nelson as described in the proceeding Finding of Fact, Cetraro set forth the

amount of Bilanzich's balloon payment as of November 30, 1999, the date by

which Nelson balloon payment to the Burgetts was due, the amount of Nelson balloon payment to the Burgetts and the amount of Bilanzich balloon payment on May 1, 2007 if the Burgetts would waive the due on sales clause in their existing mortgage and extend their balloon to May 1, 2007.   Cetraro then listed the amount of typical monthly billings for utilities.

30.     As stated above, Nelson and Lovell signed page 5 of the Letter of Intent on April 29, 1997 and Bilanzich and/or BACC USA and/or Royal Aloha Coffee Tea & Spice ("Royal Aloha") were given possession of the Condo and began making monthly payment for the use of the Condo pending any future sale of the Condo to  Bilanzich and/or BACC USA and/or Royal Aloha Coffee Tea and Spice.

31.     Bilanzich and/or BACC USA and/or Royal Aloha began making payment for the use of the Condo, however the payments were sporadic at best.

32.     Nelson continued to pay the utilities, association fees, real property taxes and other expenses associated with the ownership of the Condo.

33.     By June of 1998 Bilanzich's payments for the use of the Condo were approximately $7000 in arrears and he still had not made a decision as to whether he wanted to go forward with his purchase of the Condo.  By this

time the real estate market in Kona had softened and the value of the Condo had

declined from the $135,000 anticipated purchase price by approximately $15,000.

See Individual Condominium Unit Appraisal Report (D9) wherein the fee simple

fair market value of the Condo was determined to be $120,000 as of June 1, 1998.

34.     In April or May of 1998, Bilanzich and Jones had discussions

regarding the settlement of a lawsuit between Jones and Bilanzich and various

BACC entities owned by Bilanzich.  They subsequently entered into an Asset

Purchase Agreement whereby, *inter alia*, Royal Aloha would quit claim without

warrantees any interest it had in the Condo to Jones.

35.     On June 3, 1998 Jones sent Nelson and Cetraro a letter wherein

he enclosed a check "to cover the approximated monthly payments, maintenance

fee and utilities for the condo which  Mr. Michael Bilanzich and Bad Ass Coffee

Company are assigning to us. (P9) Jones further stated that "I understand that you

have agreed to add the past due amounts thru the end of May, 1998 to a note

which we are to sign."  Neither Nelson or Cetraro knew Jones or had any prior

communication with or from Jones regarding the Condo or otherwise.  Nelson did

not know anything about any purported transaction whereby Bilanzich was

"assigning" the Condo to Jones and she had not agreed to defer any past due

amounts owed from Bilanzich or the signing of a note by Jones re same and Jones

-12-

Case 1:01-cv-00182-KSC    Document 302    Filed 08/20/2007    Page 14 of 32

never signed a note regarding the past due amounts.  Nelson however had no

objection to Jones taking possession of the Condo so long as he paid for that

possession.

36.    Bilanzich and/or one of his entities gave Jones possession of

the Condo in June of 1999.  No DROA or other contract regarding Bilanzich

and/or Jones's future purchase of the Condo was ever negotiated or executed by

Jones and Nelson.

37.    On July 1, 1998 and thereafter Nelson began invoicing Jones

for the monthly use of the Condo.  (P8)  Nelson's first invoice to Jones did not

include any of Bilanzich's past due amounts.  Instead she began a "clean slate"

regarding the payments due for Jones use of the Condo starting June 1, 1998

wherein she credited the June 3, 1998 payment made by Jones to the amounts due

for the use of the Condo for the month of June 1998.

38.    The Bill of Sale and Assignment, (D1) whereby Bilanzich

purported to assign any interest in the Condo to Jones was signed by Bilanzich in

Jones office in January of 1999.

39.    On April 14, 1999 Royal Aloha filed a Chapter 7 Petition in

the United States Bankruptcy Court for the District of Utah. (D3)

40.    On November 19, 1999 the Royal Aloha Bankruptcy Trustee

wrote all Royal Aloha licensees, including Nelson and Cetraro,  advising that the

-13-

License Agreement was, by operation of law, deemed rejected by the Trustee 60 days after the April 14, 1999 filing of the Royal Aloha Bankruptcy Petition. (P4)

41.    On November 24, 1999 Bilanzich s wrote the same  BACC USA licensee saying that the BACC trade name had been assigned to a new entity, BACC of Hawaii, a Utah Corporation ("BACCH") prior to the filing of the Royal Aloha Bankruptcy petition and that the licensees did not have the right to use the BACC trade name or sell BACC product unless they entered into Franchise Agreement with BACCH.  Cetraro testified that he did not subsequenlty entered into a franchise agrement with BACCH because the terms of the propsoed franchise agreements were considerably less favorable than were the terms of the License Agreement.

42.    The balloon payment on Nelson's existing mortgage came due on November 30, 1999. As of that date, no DROA or other contract for the purchase of the Condo had ever been negotiated or executed and Nelson paid the Burgetts  underlying note secured by the existing first mortgage.

43.    On January 12, 2000 Jones caused a check in the amount of $7000 made payable to Michael Cetraro and/or Carol Nelson to be delivered to Cetraro. Lovell testified that he delivered the check to Cetraro who was hesitant fo cash it. Lovell further testified that he convinced Cetraro to cash the check. Cetraro testified that he cashed the check on advise of counsel. In any event ,

Cetraro did not cash the check for approximately one month. On February 14, 2000 Cetraro deposited the check into his individual account at American Bank of Montana. (D13) The American Bank of Montana account was not a joint account of Cetraro and Nelson, it was Cetraro's individual account, and Cetraro did not subsequently pay any portion of the $7000 to Nelson.

44 .     Also on January 12, 2000 Jones wrote and faxed a letter to Lovell wherein he set forth the terms of the "deal on the condo" as he understood them. Jones stated that the original purchase price was $125,000 less $50,000 for territorial rights and coffee credits. Jones acknowledged that Cetraro had told him and Bilanzich had confirmed some $7000 "due and owing because of unpaid rents." Jones further stated that he was not "holding up closing this deal", and that he did not want to be "drawn into Mike Bilanzich's fraud against Mike Cetraro" (P17)

45 .     Nelson and Cetraro were not provided a copy of Jones January 12, 2001 letter to Lovell and both testified that Jones never discussed "closing this deal", nor had Jones made a request for transfer of title and/or any other arrangement wherein Jones alleged he had a right to purchase the Condo from Nelson.

46.     BACC of Hawaii subsequently sued Nelson and Cetraro claiming that they no longer had any rights to use the BACC trade name pursuant

-15-

to the License Agreement and that any use of the trade name constituted an

unlawful infringement upon the trade name. (P7)

47.     After making the monthly payments for the months of June,

1998 to November, 1998, Jones began defaulting on his monthly Condo payments

and remained in arrears for most of the time he was in possession of the Condo.

48.     Despite Jones's default in making the monthly payments,

Nelson continued to pay the Burgetts underlying mortgage, common area

maintenance fees, taxes, and utilities because the utility services and title to the

Condo remained in her name.

49.     Jones discontinued making any payments to Nelson in

November of 2000. Jones previously claimed in this case that he discontinued

making payments to Nelson in November of 2000 because Nelson characterized

the payments as rent rather than as payments for the purchase of the Condo. Jones

subsequently claimed in this case that he discontinued making payments to Nelson

because she refused to transfer title of the Condo to him. At trial Jones business

manager Jean Hammond testified that the arrears in the payments to Nelson were

as a result of Jones cash flow problems and that no payments were made to Nelson

after November 2000 because of Jones cash flow problems.

50.     On January 18, 2001, Jean Hammond called Nelson regarding

the delinquent payments. Ms. Hammond advised Nelson that Jones hoped to catch

-16-

up with all arrears withing the next 7 - 10 days and to remain current thereafter.
Nelson advised that she had turned the matter over to her attorney and advised of
his name and address. Ms. Hammond  confirmed the telephone conversation by
letter of same date addressed to Nelson, care of her attorney, Charles Heauluana
(sic Heaukulani) (P11) Apparently a second letter addressed  and containing the
same text was put on a different letterhead and signed by Ms. Hammond but not
mailed to Nelson or Heaukulani.  (D20)

51.    Ms. Hammond's letter (P11) reiterated that payments were
past due and would hopefully be brought current within 7 - 10 days.  Ms.
Hammond testified that the arrears were due to Jones cash flow problems, and not
because anyone, including Nelson had ever referred to the monthly payments as
rent or because Nelson had refused to deliver title to the Condo to Jones.

52.    Ms Hammond's letter (P11) also stated that Jones would like
to "secure our own financing to take you out of the loop" and if unable to do that,
to jointly offer the condo for sale.  The letter also advised that the "equity in the
condo was transferred to Lahiri-Morning Star" an entity Jones identified as a
family partnership.

53.    Nelson did not understand what Ms. Hammond was referring
to in her January 18,2001 letter regarding obtain financing, jointly offering the
condo for same or the purported transfer of "the equity" in the Condo.

54.     Jones did not bring the past due amounts current within 7 - 10 days or otherwise and did not make any further payments to Nelson.

55.     On February 13, 2001 Nelson's attorney, Charles Heaukulani filed a summary possession action against Jones in the Circuit Court of the Third Circuit, State of Hawaii. Jones removed the summary possession action to this Court and filed counterclaims against Nelson and other "counterclaim defendants" alleging among other things, various conspiracies to defraud him of his interest in the Condo, conversion of the payments he had made and other theories of liability.

56.     Jones remained in possession of the Condo, however he did not make any payment to Nelson for his use of the Condo until ordered to do so by this Court.

57.     Nelson subsequently moved for summary judgment as to Counts I and III of her Complaint and as to all of Jones counterclaim. This Court dismissed Jones counterclaims and held that any agreement for the purchase of the Condo was unenforceable due to failure of condition precedent, failure of consideration and material breach by Jones.

58.     Jones appealed, however he did not seek a stay of this Court's judgment pending his appeal and voluntarily surrendered  possession of the Condo to Nelson while his appeal was pending. By the time Jones surrendered possession of the Condo to Nelson Jones  owed in excess of $25,000 for his use of

-18-

the Condo, no part of which has ever been paid. Nelson subsequently sold the

Condo to an unrelated third party.

59.    The Ninth Circuit Court of Appeals  vacated the District

Court's granting of Nelson's motion for summary judgment to the extent that:

(1)    the district court concluded that the Agreement of Sale
       was invalid due to a failure of consideration or condition
       precedent and,

(2)    the district court relied on Jones material breach of the
       Agreement

60.    The case was remanded to this Court on these two issues.

61.    On January 24, 2006, Jones filed a Motion for Clarification as

to Remaining Parties and Claims. Judge Gillmor heard the Motion and ruled that

only Count I and II of the Complaint and, by implication, Counts II (Breach of

Contract), Count III (Breach of Contract for Specific Performance) and Count V

(Declaratory Relief) of Jones Second Amended Counterclaim were reinstated.

62.    Judge Gillmor further ruled that all other claims made were not

at issue and that this matter would proceed to trial between Nelson and Jones on

the following issues:

(1)    whether the parties entered into an Agreement of Sale
       with respect to the Kona, Hawaii condominium;

(2)    if so, whether the Agreement of Sale is enforceable;
       and

(3)    who has the right to possession and ownership of the
       Kona, Hawaii condominium.

## CONCLUSIONS OF LAW

Based upon the preceding Findings of Fact, the Court concludes as

follows. Should it later be determined that any of these conclusions of law should

be properly deemed to be findings of fact, then the Court so finds as to those facts.

1.    The Court has jurisdiction over the subject matter and the

parties in this case.

2.    As to the first issue on remand, whether the parties entered into

an Agreement of Sale with respect to the Kona, Hawaii condominium, the Court

concludes that they did not. For there to be an agreement for the purchase and sale

of the Condo their must have been mutual assent or a meeting of the minds as to

all essential elements or term in order to create a binding contract. Malani v. Clapp

& Furuya, 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975); Mednick v. Davey, 87

Haw. 450, 458; 959 P.2d 439, 447 (Haw. App.,1998)   There was no meeting of

the minds at to essential terms, the foremost of these was whether Bilanzich was

actually going to purchase the Condo from Nelson. Bilanzich's decision was

contingent upon whether the Burgetts, the first mortgage holders, would waive

their due on sales clause and if so, extend the date of their balloon payments to

coincide with the term of the license agreement. These contingencies were never

resolved. If Bilanzich decided not to purchase the Condo, there would be no credit for licensees for the Montana BACC stores and Cetraro would be required to pay the license fees in which case the Condo was to be used as collateral to secure payment of the license fees.

3.    If Bilanzich decided to go forward with his anticipated purchase of the Condo, other essential terms remained to be negotiated and agreed upon. These included the receipt of trade credits for the Montana BACC stores, when the purchase price was to be paid, what would happen if the License Agreement was not honored during the 10 year life of the agreement and/or what would happen if credits for BACC logo coffee and merchandise was not received as contemplated.

4.    In this case Nelson and Lovell for "M. B." signed a Letter of Intent regarding the possible future purchase of the Condo. The Letter of Intent set forth various possible scenarios regarding any future purchase of the Condo. It was understood by Nelson and Bilanzich that further negotiations would be conducted and if agreement was reached on all essential terms, their agreement would be set forth in a DROA or other formal contract to be executed by the parties. In this case, there was no Agreement of Sale for the Condo because the anticipated formal agreement subsequent to Letter of Intent was never executed by the parties. Malani v. Clapp & Furuya Id at 510, citing 17A Am.Jur.2d *Contracts* §

38 (1991) (where the parties contemplate further negotiations, no binding contract

exists); Pantzer v. Shields Development Co., 660 F. Supp. 56, 60 (D. Del. 1986)

(no contract because anticipated formal agreement subsequent to Letter of Intent

was never executed by the parties).

5.    As to the Second question on remand, even assuming that there

was an Agreement of Sale, was it enforceable?  In this case, the Letter of Intent,

even if construed as an Agreement of Sale is unenforceable.  First, the document

does not meet the minimal requirement of a written contract as required by the

Hawaii Statute of Frauds as codified in HRS, § 656-1.  To be enforceable, a

contract must be certain and definite as to its essential terms.  A party seeking to

establish a parol contract to convey real property must prove its existence and its

terms by clear and convincing evidence.  Boteilho v. Boteilho, 58 Haw. 40, 42,

564 P.2d 144, 146 (Hawai'i 1977); In Re Sing Chong Co., Ltd., 1 Haw. App. 239,

617 P.2d 578 (1980)

Part performance of the alleged contract may in some cases establish its

existence, however:

> ....The acts constituting part performance "must clearly
> appear to have been done in pursuance of the contract,
> and to result from the contract and not from some other
> relation."  (citations omitted)

Rossiter v. Rossiter, 4 Haw. App. 333, 339, 666 P.2d 617, 621 (Haw. App. 1983).

See also Lopez v. Soy Young, 9 Haw. 117 (Hawai'i 1893)

In this case the Letter of Intent is consistent with an agreement to allow for the use of the property pending a decision as to whether the tenant, in this case Bilanzich or one of his entities, decided to purchase the property. The cost of that use was set forth in  the Letter of Intent along with language indication that if there was to be a sale, additional terms would need to be negotiated and agreed upon and evidenced by a written agreement to be prepared by Bilanzich's counsel, provided to Nelson for her and/or her counsels review, and subject to Nelson's approval.

6.     An agreement of sale of land which contains complete and certain essential terms is a valid and enforceable contract if the facts indicate that the parties at the time it was entered into had no expectation of further provisions to be negotiated later. Essential terms are the identification of the parties, a description of the property sold, the price, the time and manner of payment and any other terms in the agreement which are essential to the agreement. Miller v. Pepper,  2 Haw. App. 629, 631, 638 P.2d 864, 866
(Hawaii App., 1982)

7.     The document which Jones argues is the "Agreement of Sale" does not contain complete essential terms as required by the Hawaii statute of frauds. The parties are not identified with any certainty. The document was

signed by Nelson and "D. W. Lovell for M. B." There is no description of the property to be sold pursuant to the alleged agreement. The anticipated purchase price for the property, $135,000 is not listed. The time and manner of the payment of the $135,000 purchase price is not set forth, instead, the document contains two amortization schedules which Jones characterizes as "options." Moreover the alleged agreement does not contain essential terms relating to the credits for license fees and credits for the purchase of BACC logo coffee and merchandise which Jones argues was the "down payment" for the purchase of the property nor does it contain any provisions as to the rights and/or obligations of the parties should the "down payment" fail. Although many of these terms were the subject of discussion between the parties and the substance of those discussions was provided during trial by Nelson and Cetraro, it was their unwavering testimony that these were discussion only based upon possible future events and that no agreements were reached regarding these essential terms.

8.    Moreover, It is undisputed that any agreement regarding the sale of the Condo was contingent upon Cetraro and Nelson receiving the rights to operate five (5) BACC stores in Montana for a period of ten (10) years and trade credits for coffee and/or merchandise. The right to operate BACC stores in Montana was a dependent condition to any sale of the Condo and was directly tied to the consideration to be paid for the purchase of the Condo. ( "...if the covenant

-24-

is inherent in the subject matter of sale or is inseparable from the consideration as a whole, it is dependent." Am Jur Vendor and Purchaser §62) In this case there can be no question that there was a total failure of consideration and/or a dependent condition. The Trustee in the Royal Aloha Bankruptcy case rejected the License Agreement. (P4) Shortly thereafter Bilanzich wrote all BACC licensees claiming that Royal Aloha had transferred the trade name to BACCH before filing Bankruptcy and that licensees, including Nelson and Cetraro had no further rights to use the BACC trade name or to sell BACC logo merchandise. (P5) Bilanzich thereafter refused to sell any coffee or other logo products to Nelson and Cetraro and they received only about $5000 of the $20,000 in trade credits they were bargaining for. Bilanzich (BACC of Hawaii, Inc.) subsequently sued Nelson and Cetraro to enjoin them from any further use of the BACC trade name, (P7). Nelson and Cetraro were forced to close down the two BACC stores in Montana they had opened after only 2 ½ years of the 10 years license had lapsed. They were denied the right to operate 5 BACC stores for 10 year as provided for by the License Agreement. The Court concludes based upon these facts that there was a complete failure of conditions precedent and a failure of the consideration which Nelson was to receive as  payment for the Condo.

       9.     It is also clear that even if there was an Agreement of Sale for the Condo, and even if there had been no failure of conditions precedent and of

consideration on the part of Bilazich, Royal Aloha, BACC USA and/or related entities, Jones was in material breach of the very agreement he seeks to enforce in this action. Jones own evidence shows that he failed to make the monthly payments when required. He never fulfilled his "hope" to bring the payments current (P11) and Nelson pursued her legal remedies by filing this action. Jones corporate secretary, Jean Hammond, testified that the reason for non payment to Nelson was due to Jones cash flow problems and not due to any claim by Nelson that the payments that were made were "rent" or because of Nelson's alleged refusal to deliver title to Jones. Jones failure to make the payments to Nelson was not excused by repudiation of the agreement by Nelson or otherwise. As of the date Jones voluntarily surrendered possession of the Condo to Nelson, Jones owed Nelson approximately $25,000 for his past use of the Condo, no part of which has ever been paid.

10.     It is undisputed that any claim Jones has concerning a right to purchase the subject property was acquired from Bilanzich pursuant to the Bill of Sale and Assignment executed by Bilanzich in January of 1999. (D10) As stated in Am Jur Assignments § 164:

> "Because the assignee takes the rights assigned with all the burdens to which it was subject in the hands of the assignor, if the assignee undertakes to enforce the right by an action, he or she must show that any applicable condition or burdens have been performed, either by the assignor or by himself."

In this case is undisputed that Bilanzich did not perform all conditions to his anticipated purchase of the property. He did not give Nelson and Cetraro the rights to operate the 5 BACC stores in Montana for 10 years. A License Agreement was executed by Nelson and Cetraro and presumably at some later date by Bilanzich. However 2 ½ years into the License Agreement Bilanzich withdrew any rights granted pursuant to the License Agreement, refused to sell coffee or other merchandise to Nelson and/or Cetraro, failed to honor any agreed upon trade credits and sued Nelson and Cetraro to enjoin them from operating any BACC stores in Montana or otherwise selling any BACC products. Jones did not offer and could not offer to cure Bilanzich's obligations under any agreement granting Bilanzich the right to purchase the Condo. Jones was not the owner of the BACC trade name and could not authorize Nelson and Cetraro to continue operating BACC stores or selling BACC product. It is therefore concluded that any rights Bilanzich assigned to Jones for the purchase of the purchase of the Condo were unenforceable by Jones because of Bilanzich breach and/or failure to perform.

11.   Lastly, the purported assignment from Bilanzich to Jones of any rights to purchase the Condo was invalid. In this case, the liability of Bilanzich the assignor, to perform pursuant to the original contract is a vital element of the original contract rendering the original contract non assignable to Jones. Generally contracts are assignable, even when executory in nature.

However, when the substitution of a right of the assignee for the right of the assignor would materially change or increase the burden or risk of the obligor or materially impair the chance of obtaining return performance, the contract is unassignable. In this case the substitution of Jones right to purchase the Condo for Bilanzich's right to purchase pursuant to the purported assignment materially increase Nelson risk and chance of obtaining a return performance. Bilanzich purportedly received from Jones everything he had in the transaction, i.e. a $50,000 credit against settlement of Jones claims against him. His performance however was still on going, i.e. he had to continue to provided Nelson and Cetraro with the rights to operate BACC stores in Montana for the remaining 8 plus years of the License Agreement and to provide the trade credits, both of which were to form a significant portion of the consideration Bilanzich was to give Nelson for the Condo. Assignment of the rights to the Condo to Jones removed any motivation Bilanzich might have otherwise had to continue with his performance, i.e. provide rights for BACC stores in Montana and the trade credits. Nelson's risk of failure of a continuing return performance by Bilanzich was substantially increased as evidenced by the fact that shortly after the purported assignment to Jones, Bilanzich began defaulting on all of his obligations to Nelson under the alleged Agreement of Sale. The Court therefore concludes that the nature of the purported Agreement of Sale and the continued performance of Bilanzich

-28-

thereunder made the agreement unassignable and the purported assignment by Bilanzich to Jones was void *ab initio* as a matter of law.

    12. Nelson is entitled to judgement in her favor as to Count I ("Summary Possession") and Count II ("Declaratory Relief") of the Complaint.

    13. Nelson is also entitled to judgment in her favor as to Count II of Jones Second Amended Counterclaim.

    14. The Court concludes that Count III (Breach of Contract for Specific Performance) and Count V (Declaratory Relief) of Jones Second Amended Counterclaim are rendered moot as a result of the sale of the Condo to an unrelated party during the pendency of this action.

## **DECISION AND ORDER**

Based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby

    **ORDERED, ADJUDGED, AND DECREED** that judgment be entered accordingly, in form and content consistent with these findings and conclusions.

    DATED: Honolulu, Hawaii,_____

_____

KEVIN S. S. CHANG
Magistrate Judge

DATED:    Honolulu, Hawaii, August 20, 2007.

ENVER W. PAINTER, JR.
Attorney for Plaintiff/Counterclaim
DefendantCAROL J. NELSON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CAROL J. NELSON,            )   CV 01-00182 KSC
         Plaintiff,      )
   vs.                   )
                     )
ROBERT ALAN JONES    )
         Defendant.   )
_____ )
                     )
ROBERT ALAN JONES    )
         Counterclaimant, )
   vs.                   )
                     )
CAROL NELSON         )
   Counterclaim Defendant   )
_____)

CERTIFICATE OF SERVICE

I hereby certify that on below date a true and correct copy of the

foregoing was duly served upon the following individuals by hand delivery at the

following address:

        ROBERT E. CHAPMAN
        MARY MARTIN
        700 Bishop Street, Suite 2100
        Honolulu, Hawaii 96813

   DATED:    Honolulu, Hawaii, August 20,2007

                                 _____
              ENVER W. PAINTER, JR.
              Attorney for Plaintiff/Counterclaim
              Defendant  CAROL J. NELSON