IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CAROL J. NELSON,           ) CIVIL NO. 01-00182 KSC
                             )
        Plaintiff,     ) FINDINGS OF FACT AND
                             ) CONCLUSIONS OF LAW
    vs.                  )
                             )
ROBERT ALAN JONES,     )
                             )
        Defendant.     )
―――――――――――――――――――――― )
                             )
                             )
ROBERT ALAN JONES,     )
                             )
        Counterclaimant, )
                             )
    vs.                  )
                             )
CAROL NELSON,          )
                             )
        Counterclaim     )
        Defendant.     )
―――――――――――――――――――――― )

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves the rights of possession and ownership of a condominium known as the Kona Plaza, Unit 406, located in Kailua-Kona, on the island of Hawaii in the State of Hawaii.  On February 13, 2001,

Plaintiff Carol Nelson ("Nelson") filed a Complaint in
the Third Circuit, State of Hawaii, for Summary
Possession, Ejectment and Damages.  On March 23, 2001,
Defendant Robert Alan Jones ("Jones") removed the case
to this Court on the grounds that this Court has
diversity jurisdiction.

On April 2, 2001, Jones filed his Answer and a
Counterclaim Joining Additional Counterclaim
Defendants.  On April 25, 2001, Nelson filed her Answer
to Jones' Counterclaim.  On October 10, 2001, Jones
filed his Second Amended Counterclaim and added
additional Counterclaim Defendants.  On November 15,
2001, Nelson filed her Answer to Jones' Second Amended
Counterclaim.

On February 19, 2003, Chief United States
District Judge Helen Gillmor entered an Order Granting
Plaintiff Carol J. Nelson's and Counterclaim Defendant
Michael Cetraro's Motion for Summary Judgment and for
Expungement of Lis Pendens Filed August 28, 2002
("February 19, 2003 Order").  In the February 19, 2003
Order, Judge Gillmor granted Nelson and Counterclaim

2

Defendant Michael Cetraro's ("Cetraro") motion for
summary judgment as to Count I (summary possession) and
Count III (declaratory relief) of Nelson's Complaint.
February 19, 2003 Order at 46.  The Court declared that
Nelson was the legal owner of the condominium at issue
located in Kona, Hawaii.  Id.  The Court also granted
Nelson's and Cetraro's motion for summary judgment as
to Counterclaims I-VIII of Jones' Second Amended
Counterclaim.  Id.

     Jones appealed the February 19, 2003 Order
granting summary judgment in favor of Nelson and
Cetraro as to Count I (summary possession) and Count
III (declaratory relief) of Nelson's Complaint.  See
Order Clarifying Remaining Parties and Claims filed
April 26, 2006 ("April 26, 2006 Order") at 2.

     On June 27, 2003, Nelson dismissed the
remaining claims in her Complaint: Counts II, IV, V,
and VI. Id. at 2.

     On January 18, 2005, the Circuit Court for the
Ninth Circuit Court of Appeals entered an Order
Vacating and Remanding as to the Court's February 19,

3

2003 Order.  Id. at 3; Nelson v. Jones, No. 03-16542,
2005 WL 89421 (9th Cir. Jan. 18, 2005).  The Ninth
Circuit stated that "[t]o the extent that the district
court concluded that the Agreement of Sale was invalid
due to a failure of consideration or condition
precedent, it erred because the Agreement does not
clearly and unequivocally condition the sale of the
condominium on the successful completion of the
Licensing Agreement." Nelson, 2005 WL 89421, at *1.
Material issues of fact remain as to the circumstances
under which the Licensing Agreement failed.  Id.  In
addition, the Ninth Circuit concluded that "[t]o the
extent the district court relied on Jones' material
breach of the Agreement of Sale to grant summary
judgment, it erred because there is a material issue of
fact as to whether Jones suspended his performance
until he received assurance that Nelson would perform
under the contract, as is permitted under Hawaii law."
Id.  Accordingly, the Ninth Circuit vacated the Court's
February 19, 2003 Order and remanded the case.

4

On January 24, 2006, Jones filed Defendant's
Motion for Clarification as to Remaining Parties and
Claims. Id.  On April 26, 2006, the Court issued an
Order Clarifying Remaining Parties and Claims.  The
Court construed the Ninth Circuit Order to indicate
that only Counts I and II of the Complaint and
Counterclaims II, III, and V are reinstated and found
that the remaining counterclaims in Jones' Second
Amended Counterclaim were not at issue. Id. at 6.
Therefore, the Court held that this matter shall
proceed to trial on the issues of: (1) whether the
parties entered into a Agreement of Sale with respect
to the Kona, Hawaii condominium; (2) if so, whether the
Agreement of Sale is enforceable; and (3) who has the
right to possession and ownership of the Kona, Hawaii
condominium.  Id. at 6-7. The Court additionally
clarified that because Michael Cetraro ("Cetraro") is
not a party to any of these claims he is not a party in
these proceedings on remand. Id.

This matter came on for bench trial on August 7 8, and 9, 2007.

The Court having examined the evidence admitted at trial, and having considered the written submissions and the record and file herein, pursuant to Rules 52 and 73 of the Federal Rules of Civil Procedure makes the following Findings of Fact and Conclusions of Law and FINDS in favor of Nelson.

Findings of Fact

1. This matter was originally filed in the Circuit Court of the Third Circuit, State of Hawaii, by Nelson against Jones to establish Nelson's right to ownership, possession and use of a piece of real property located in Kailua-Kona, on the island of Hawaii in the State of Hawaii.[1]

---

[1] Nelson's original Complaint filed on February 13, 2001, asserted claims for summary possession (Count I), slander of title (Count II), declaratory relief (Count III), intentional interference with prospective economic advantage (Count IV), negligent interference with prospective economic advantage (Count V), and unjust enrichment (Count VI).

2.  On March 23, 2001, Jones filed a Notice of Removal and removed the case to this Court on the grounds that this Court has diversity jurisdiction.

3.  On April 2, 2001, Jones filed his Answer and Counterclaim Joining Additional Counterclaim Defendants seeking to establish his rights in the subject property and adding Michael Cetraro ("Cetraro"), Charles Heaukulani ("Heaukulani"), and Robert Shelby ("Shelby") as Counterclaim Defendants.

4.  On October 10, 2001, Jones filed his Second Amended Counterclaim and added Michael Bilanzich ("Bilanzich") and Jeffrey Gross ("Gross") as additional Counterclaim Defendants.[2]

_____

[2]  In his Second Amended Counterclaim, Jones alleged the following counterclaims: (1) conspiracy to defraud Defendant against Nelson and Cetraro (First Counterclaim); (2) breach of contract against Nelson (Second Counterclaim); (3) breach of contract for specific performance against Nelson (Third Counterclaim); (4) conversion of assets against Nelson and Cetraro (Fourth Counterclaim); (5) declaratory relief against Nelson (Fifth Counterclaim); (6) interference with prospective economic advantage against Nelson and Cetraro (Sixth Counterclaim); (7) unjust enrichment against Nelson and Cetraro (Seventh Counterclaim); (8) conspiracy to illegally deprive Defendant of property rights against Cetraro, Shelby,

5.   The only remaining parties in this case are Nelson and Jones.

6.   The real property at issue in this case is a condominium described as Apartment 406 of the condominium project known as "Kona Plaza", located at 75-5719 Ali`i Drive, Kailua-Kona, Hawaii, as shown on Condominium Map No. 273, as amended, filed in the Bureau of Conveyances of the State of Hawaii on April 26, 1973 ("the Condo").

7.   Nelson had legal title to the Condo during the relevant time period and sold the Condo on January 8, 2004.[3]

8.   While visiting Hawaii in February or March of 1997, Cetraro, Nelson's "significant other", stopped into a coffee shop called Bad Ass Coffee Company ("BACC") in Kailua-Kona, Hawaii.

_____

Heaukulani, Bilanzich and Gross (Eighth Counterclaim); (9)fraud against Bilanzich (Ninth Counterclaim); and (10) unjust enrichment against Bilanzich (Tenth Counterclaim).

[3]   On January 8, 2004, Nelson sold the Condo to a third-party.

9.   In that shop, Cetraro had a conversation with Dennis Lovell ("Lovell"), Mike Bilanzich's ("Bilanzich") business partner, regarding Cetraro and Nelson operating BACC stores in Montana.

10.   Lovell testified that he knew that Nelson owned a condominium in Kona Plaza that Bilanzich might be interested in purchasing because Bilanzich was in immediate need of a condominium in Kona to house BACC employees.

11.   Cetraro and Lovell testified that they had general discussions with one another regarding selling Nelson's Condo to Bilanzich in exchange for BACC licensing agreements, trade credits, and additional payments.

12.   Cetraro testified that he also had discussions regarding the licensing agreements with Bilanzich, President and Chief Executive Officer of Royal Aloha Coffee, Tea & Spice Co. ("Royal Aloha") d/b/a/ The Bad Ass Coffee Company USA ("BACC USA"), who resided in Utah at the time, over the telephone.

9

13.    Based on the testimony of Nelson, Cetraro, and Lovell, the evidence shows that in April 1997, Nelson, Cetraro, and Lovell generally agreed to the following: (1) Nelson would transfer ownership and possession of the Condo to Bilanzich or one of his entities in exchange for licensing agreements authorizing Nelson and Cetraro to open and operate five (5) BACC stores in Montana for a period of ten (10) years; (2) the purchase price for the Condo was $135,000; (3) the purchase price would be reduced by $65,000 to reflect the $45,000 value of the licensing agreements, and $20,000 for coffee merchandise credits; and (4) Bilanzich would make monthly payments to Nelson and make a balloon payment either in 1999 or 2007 ("the Agreement").  The Court finds Nelson, Cetraro, and Lovell generally to be credible witnesses.

14.    Bilanzich, on behalf of BACC USA, and Nelson and Cetraro, on behalf of BACC of Montana, entered into a License Agreement dated April 23, 1997.[4]

_____

[4] Cetraro testified that he never received a signed copy of the License Agreement with Bilanzich's

10

Def.'s Exh. D2 (License Agreement, Addendum "A"--
Agreement between BACC USA (Bilanzich) and BACC Montana
(Nelson and Jones)) D4 (Agreement between BACC USA and
Cetraro re: Cetraro's permission to sell licenses).
Lovell testified that Bilanzich drafted the License
Agreement and issued the licenses.  The License
Agreement gave BACC the right to use the trade name
"Bad Ass Coffee Company" in five (5) store locations in
Montana for ten (10) years. Id.  The License Agreement
did not mention or refer to the Condo.

        15.  Although the License Agreement is dated
April 23, 1997, Nelson and Cetraro claim that they
signed the License Agreement at the same time as Def.'s
Exh. D8 (Agreement of Sale or Letter of Intent).

        16.  The evidence shows that Cetraro drafted a
5-page document, dated April 27, 1997, that reflects
the discussions he had with Lovell. Pl.'s Exh. 1
(Letter of Intent, 5 pages).  Based on the testimony
presented, the Court finds that page 5 of this document
_____
signature until his deposition was taken in September
2000.

(Exh. D8) generally reflects the Agreement entered into by Nelson, Cetraro, Lovell, and Bilanzich. Pl.'s Exhibit 2; Def.'s Exhibit D8.   Nelson and Lovell, on behalf of "M.B." (Bilanzich) signed Exh. D8 on April 29, 1997. Id.  Nelson testified that she understood "M.B." to be Mike Bilanzich.

17.  Specifically, Exh. D8 lists the following information: (1) a value of $90,000 for the property; (2) a financial payoff of $70,000, which was amortized on a 24-year schedule at 10%; (3) two options for the buyer to make a balloon payment: November 30, 1999 or May 1, 2007; (4) a due date of November 30, 1999 for the seller's balloon payment; and (5) a list of "typical monthly billing" that includes electricity, cable, water, etc. Id.

18.  Nelson, Cetraro, and Lovell all testified that they understood that the $90,000 purchase price reflected a $45,000 reduction for the BACC licenses. The evidence shows that Nelson, Cetraro, Lovell, and

Bilanzich all knew that the property referenced in Exh.
D8 was the Condo.

19.  Exh. D8 also contains additional phrases.
For example, "buyer will be responsible for this
billing at / /97" is stated on Exh. D8.  Id.  Cetraro
and Nelson testified that this date was left blank
because Bilanzich had not yet decided whether he or one
of his entities would be purchasing the Condo.

20.  Exh. D8 also states that "[Nelson] will
continue to pay bills for buyer until paperwork done.
Co tenancy until that time, proxies, ownership, etc.
Seller turn over the title when ballon[sic]
arrangements are made, and note signed" and "[w]ill
maintain first and second position, depending what 1st
mortgage holder will agree to" and "[s]ign two quick
claim deeds for title." Id.

21. Regarding the balloon payment options, Exh.
D8 states, "[i]f pay balloon plus balance receive title
plus fee simple signed." Id.  Nelson testified that
there was never any agreement as to when the balloon

payment would be made, but acknowledged that Exh. D8 listed two options.

22.   The parties do not dispute that Nelson, Cetraro, Lovell, and Bilanzich reached an agreement to sell Nelson's Condo in exchange for BACC licensing agreements, coffee merchandise credits, and additional payments.  Rather, they disagree as to whether Exh. D8 was intended to be a letter of intent reflecting preliminary negotiations or a contract of sale.  In addition, the parties disagree as to whether the sale of the Condo was contingent upon Nelson and Cetraro's ability to use the BACC licenses for the entire 10-year period.

23.   Specifically, Nelson testified that she understood Exh. D8 to be a "letter of intent", or a preliminary document prepared for the anticipated sale of the Condo.  Nelson stated that she signed Exh. D8 because Lovell seemed in a hurry to move into the Condo and Nelson and Cetraro wanted to begin operating the BACC stores in Montana.  Nelson additionally testified

14

that her understanding was that additional paperwork
would need to be completed and signed before the sale
of the Condo could go forward.

24. Nelson and Cetraro testified that they
understood that Bilanzich would make monthly payments
for the use of the Condo until Bilanzich decided
whether he or one of his entities would purchase the
Condo.

25. Regarding the first mortgage on the Condo,
Nelson testified that she thought that title to the
Condo could not be transferred until she paid off the
first mortgage.  Cetraro also testified that at the
time Exh. D8 was signed, he had not yet checked with
the first mortgage holder to find out when they would
accept a balloon payment.

26. Cetraro testified that Bilanzich told him
that he would prepare the additional paperwork.

27. There is no dispute that no additional
paperwork was ever prepared regarding the sale of the
Condo.

28. The evidence shows that shortly after Exh. D8 was signed, Bilanzich and/or employees of BACC USA and/or Royal Aloha took possession of the Condo and Bilanzich began making monthly payments to Nelson.

29. Nelson and Cetraro testified that in the summer of 1997 they opened two BACC stores in Montana (one in Helena and one in Bozeman), in good faith reliance on the License Agreement. Nelson and Cetraro testified that they never paid Bilanzich any cash for the BACC licenses.

30. Cetraro testified that after opening the BACC stores in Montana, the BACC coffee merchandise credits were hit or miss. Cetraro testified that he received about $5,000 in coffee credits and had some problems redeeming credits.

31. Nelson testified that Bilanzich and/or BACC USA and/or Royal Aloha made payments for the use of the Condo, but the payments were sporadic at best.[5]

_____

[5] Nelson testified that prior to September 1997, she rented the Condo for approximately $1,500/month.

16

Nelson testified that she did not attempt to evict Bilanzich because she and Cetraro wanted to continue to operate BACC stores in Montana.  The evidence shows that by June 1998 Bilanzich's payments related to the Condo were approximately $7,000 in arrears.

    32.  Jones testified that he first heard about the Condo during settlement discussions with Bilanzich. Jones testified that he saw Exh. D8 and understood it to be an agreement of sale.[6]  Jones stated that he saw that the License Agreement had been executed and his understanding was that this part of the agreement had already been satisfied.  The Court, considering the fact that Jones is an experienced litigation attorney, finds it questionable that Jones would construe Exh. D8 as a complete, valid agreement of sale for real property.

    33.  As part of a settlement agreement, Bilanzich/Royal Aloha transferred its interest in the

---

[6] Although Jones testified that he showed Exh. 8 to a real estate lawyer and was told it was a valid agreement of sale, the Court gives little weight to this testimony given Jones' credibility.

17

Condo to Jones/Bad Ass Coffee Limited Partnership, effective July 1, 1998. Def.'s Exh. D1 (Bill of Sale and Assignment), Exh. D5 (Asset Purchase and Sales Agreement b/ BACC Hawaii and Jones). Jones further testified that he paid Bilanzich $50,000 for the assignment of Bilanzich's rights in the Condo. Def.'s Exh. D3 (Royal Aloha Bankruptcy Documents).

34. On June 3, 1998, Jones sent a letter to Nelson and Cetraro informing them that Bilanzich had assigned his interest in the Condo to Jones. Pl's Exh. 9 (letter from Jones to Nelson and Cetraro with Check No. 1034). Jones enclosed a check in the amount of $1131.20 with his letter "to cover the approximated monthly payment, maintenance fees and utilities" for the Condo. Id. In part, the letter states, "I understand that you have agreed to add the past due amount thru the end of May, 1998 to a note which we are to sign...we would appreciate a current statement so that we will have an up-to date amount to add to the note." Id.

18

35.  Nelson testified that after June 3, 1998, she began sending the monthly invoices to Jones for his use of the Condo.  Pl.'s Exh. 8 (monthly invoices for use of the Condo, from June 1998 through Jan. 15, 2001).  The evidence shows that Nelson did not include and carry over the $7,000 that Bilanzich owed her onto Jones' invoices.  Id.

36.  Jones, Nelson, Cetraro, and Lovell testified that sometime in late June 1998, they all met at Cetraro's apartment in Kona Plaza.  Nelson and Cetraro testified that this was the first time that they had met Jones and stated that it was a social meeting.  Jones testified that the meeting lasted about 15 minutes and that they discussed the transfer of Bilanzich's rights in the Condo to Jones.  Nelson testified that she does not recall Jones' purchase of the Condo being discussed.  To the contrary, Jones testified that Nelson would not let him assume Bilanzich's contract unless Jones paid the $7,000 owed by Bilanzich.

37.   Jones testified that his understanding was that a balloon payment on the Condo would be due in 2007, and that if he wanted to take title earlier than 2007, he would have to make the balloon payment before then.

38.   Jones testified that he obtained possession of the Condo on July 1, 1998 and remained in possession until March/April 2003.

39.   The evidence shows that Jones did not always pay Nelson's invoices in full or in a timely manner. Pl.'s Exh. 8.  Jones and his office manager, Jean Hammond ("Hammond"), testified that the reason for the late and incomplete payments was due to Jones' illness and hospitalization in early 1999.  Hammond testified that she handled all of the invoices sent by Nelson and that she was responsible for paying the invoices.  The Court finds Hammond to be a credible witness.

40.   Hammond testified that her understanding was that the payments she was making to Nelson were

payments due on the loan for the purchase of the Condo. The evidence shows that the a portion of the monthly payment ($629.81) listed on the invoices Nelson sent to Hammond is the same as that listed on the amortization schedule on Exh. D8. Def.'s Exh. D8; Pl.'s Exh. 8. Hammond stated that she did not know anything about a balloon payment.

41.   On March 13, 1999, the Bad Ass Coffee Limited Partnership assigned rights in the Condo to Lahiri-Morning Star Limited Partnership on March 13, 1999. Def.'s Exh. 17 (Bill of Sale and Assignment from Bad Ass Coffee Ltd. to Lahiri-Morning Star LP). Hammond testified that Jones transferred his interest for the benefit of his family, due to his illness.

42.   On April 14, 1999 Royal Aloha filed a Chapter 7 Petition in the United States Bankruptcy Court for the District of Utah. Def.'s Exh. 3.

43.   On November 19, 1999, the Royal Aloha Bankruptcy Trustee wrote to Royal Aloha/BACC USA licensees advising them that the Trustee had rejected

the license agreements. Pl's Exh. 4 (letter from Adam Affleck to BACC licensees).

44.   On November 24, 1999, Bilanzich wrote all BACC USA licensees saying that the BACC trade name had been assigned to a new entity, BACC of Hawaii, a Utah Corporation, ("BACCH") prior to the filing of the Royal Aloha Bankruptcy petition and that licensees would no longer be authorized to use the BACC trade name unless they entered into a Franchise Agreement with BACCH before December 31, 1999. Pl.'s Exh. 5 (letter from Bilanzich to BACC licensees).

45.   Cetraro testified that he did not enter into a Franchise Agreement with BACCH because it was a bad deal. See Pl.'s Exh. 5.  In particular, Cetraro recalls that Bilanzich offered Cetraro four (4) franchise agreements for five (5) years and $4,000 in coffee merchandise credits and Cetraro would have to pay advertising and royalty fees.

46.   Cetraro testified that he closed the BACC store in Montana towards the end of 1999.

47.  However, BACCH subsequently sued Nelson and Cetraro in January 2000. Pl.'S Exh. 7 (letter from Jefferson W. Gross to Dael E. Reagor dated January 21, 2000).

48.  In addition, on April 10, 2001, the Bankruptcy Trustee of the chapter 7 bankruptcy estate of Royal Aloha, J. Kevin Bird, sent Nelson and Cetraro a letter demanding payment of $57,358.07 for their use of licenses valued at $50,000 and payments related to the Condo that were made to them in the amount of $7,358.07.  Pl.'S Exh. 13.  Nelson and Cetraro testified that they did not pay the $57,358.07 and were later sued for that amount.

49.  Cetraro testified that he recalls settling the litigation, but he could not remember the amount of the settlement.

50.  On November 30, 1999, Nelson paid the balloon payment due on the existing first mortgage on the Condo.

51.  The evidence shows that Jones made payments (some of which were incomplete or untimely) to Nelson and Cetraro from June 1998 to November 2000. Pl.'s Exh. 8 and 10; Def.'s Exh. 28.  After November 3, 2000, Jones stopped making payments to Nelson until the Court ordered him to resume making payments in April, 2002.  Jones testified that part of the reason he stopped making payments was that he heard from Lovell that Nelson was not going to give him title to the Condo.  Jones testified that he tried to contact Nelson's attorney for an explanation and claims that he received no response.

52.  Jones sent a check for $7,000 dated January 12, 2000 to Cetraro and Nelson. Def.'s Exh. D13.  The evidence shows that Cetraro waited approximately a month to cash the check. Id.  Cetraro testified that he cashed the check because his lawyers advised him to accept it as back rent.  Nelson testified that she does not recall why Cetraro placed the check in his account instead of hers.

24

53.  On January 18, 2001, Hammond wrote to Nelson acknowledging that payments to Nelson were past due and stated that they hoped to bring all arrears current within 7-10 days. Pl.'s Exh. 11. The letter also stated that Jones would like to "secure our own financing to take you out of the loop" and if unable to do that, to jointly offer the Condo for sale. Id.

54.  The evidence shows that in January and February 2001, Lahiri-Morning Star Limited Partnership attempted to communicate with Nelson and her counsel about various proposals regarding the Condo. See Def.'s Exh. D22, and D23.

55.  On February 13, 2001, Nelson filed a summary possession action in the Circuit Court of the Third Circuit, State of Hawaii. Def.'s Exh. D26 (copy of Complaint for Summary Possession, Ejectment, and Damages).

56.  On March 2, 2001, Jones sent a letter to Nelson's attorney, Charles Heaukulani, requesting that

Nelson transfer title to the Condo.  In the letter, Jones offered to pay the purchase price through escrow. Pl.'s Exh. 12 (letter from Jones to Heaukulani).

57.  On March 6, 2001, Jones was served with Nelson's Complaint.

58.  On March 12, 2001, Jones sent Nelson a letter offering to take some responsibility for the ongoing Condo expenses so he could remain in possession of the Condo. Def.'s Exh. D25 (letter from Jones to Heaukulani re: condo possession).  Jones testified that he received no response to this letter.

59.  On March 30, 2001, Lahiri Morning Star Partnership transferred its rights in the Condo to Jones, personally. Def.'s Exh. D18 (Assignment and Transfer of Interest from Lahiri Morning Star to Jones).

60.  Beginning on April 15, 2002, Jones resumed making monthly payments to Nelson in the amount of approximately $1,200, consistent with the agreement

reached between Nelson and Jones subsequent to the Court hearing on April 1, 2002. Def.'s Exh. D28.

61. Hammond testified that Nelson received approximately 51 payments for the Condo, including 13 from Bilanzich and 39 from Jones. See Id.

62. On January 8, 2004, Nelson sold the Condo to a third party for $275,000. Nelson testified that she did not give any of the proceeds to Jones.

63. Robert Lawrence ("Lawrence"), a residential real estate appraiser in Kona, Hawaii, testified regarding the fair market value of the Condo. Pursuant to counsel's stipulation, the Court deemed Lawrence a qualified expert in the field of residential real estate appraisal in Kona. Lawrence testified that he never conducted any interior inspections on the Condo and he based his appraisal assuming a condominium of average condition in Kona Plaza. Lawrence estimated that the market value of the Condo in June 1998 (when Jones was assigned the interest in the Condo) was $120,000. Def.'s Exh. D9. Lawrence estimated that the

27

fair market value in April 2003 (when Jones gave up possession of the Condo) was $205,0000. Def.'s Exh. D10.  Lawrence estimated the fair market value of the Condo in February 2007 to be $375,000. Def.'s Exh. D11.

64.  On January 18, 2005, the Circuit Court for the Ninth Circuit Court of Appeals entered an Order Vacating and Remanding the Court's February 19, 2003 Order granting Nelson's motion for summary judgment.

65.  On April 26, 2006, the Court issued an Order Clarifying Remaining Parties and Claims, and ruled that this matter would proceed to trial between Nelson and Jones on the following issues:

(1) whether the parties entered into an Agreement of Sale with respect to the Kona, Hawaii condominium;

(2) if so, whether the Agreement of Sale is enforceable; and

(3) who has the right to possession and ownership of the Kona, Hawaii condominium.

Conclusions of Law

1.  The Court has jurisdiction over the subject matter and parties in this case.

2.  The first issue on remand is whether the parties entered into an Agreement of Sale with respect to the Condo.  In order to resolve this issue, the Court must first determine whether Nelson and Bilanzich entered into an Agreement of Sale.

3.  "In Hawaii, the term 'agreement of sale' denotes an agreement binding the vendor to sell and the purchaser to buy real property.  Normally, under such an agreement, the purchaser is entitled to immediate possession." State Sav. & Loan Ass'n v. Kauaian Development Co., 445 P.2d 109, 112, n.2 (Haw. 1968).

4.  In an agreement of sale, the legal title to a property remains in the seller while the purchaser accrues an equitable interest in the land when an agreement of sale is executed and delivered. Jenkins v. Wise, 574 P.2d 1337, 1340 (Haw. 1978).  Legal title remains in the seller's name as security for the payment of the purchase price. Id. at 1341.

29

5.  As with any contract, "[t]here must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract....The existence of mutual assent or intent to accept is determined by an objective standard.... Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties." <u>Earl M. Jorgensen Co. v. Mark Construction, Inc.</u>, 540 P.2d 978, 982 (Haw. 1975); <u>see</u> <u>also</u> <u>Malani v. Clapp & Furuya</u>, 542 P.2d 1265, 1267 (Haw. 1975)("where a contract is complete and certain with respect to the essential and material terms and conditions of a lease, and no further negotiations as to other essential matters are contemplated, such a contract to enter into a lease will be enforced").

6.  Where the parties contemplate further negotiations, no binding contract exists. <u>Malani</u>, 542 P.2d at 1267 (quoting 17A Am. Jur. 2d Contracts § 38 (1991)("[w]hether the parties to an oral or informal agreement become bound prior to the drafting and

execution of a contemplated formal writing is largely a question of intent, or, as sometimes expressed, upon whether they intend the formal writing to be a condition precedent to the taking effect of the agreement.  If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed").

7.  In Hawaii, "[a] party seeking to establish a parol contract to convey real property must prove its existence and its terms by clear and convincing evidence." Boteilho v. Boteilho, 564 P.2d 144, 146 (Haw. 1977); In Re Sing Chong Co., Ltd., 617 P.2d 578 (Haw. App. 1980).

8.  In addition to mutual assent, there must also be consideration to create a valid contract. See Douglass v. Pflueger Hawaii, Inc., 135 P.3d 129,

143 (Haw. 2006)("[i]t is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract. Consideration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment"). In the absence of fraud, any sum paid or contracted to be paid is sufficient consideration to make a conveyance of realty valid. <u>See</u> <u>State v. Thom</u>, 563 P.2d 982, 988 (Haw. 1977). Failure "to perform a promise bargained for under the terms of the contract will not entitle the [a party] to rescission where they have executed their part of the contract. <u>Id.</u>

9. The Court finds and concludes that there was an Agreement of Sale between Nelson and Bilanzich in this case for the following reasons.

10. The Court finds that Jones has established by clear and convincing evidence that there was an agreement as to the essential terms for a contract for the sale of land because (1) the parties to the

32

contract were clearly known to be Nelson and Bilanzich; (2) Nelson and Bilanzich both knew the Condo was the property at issue; (3) Nelson and Bilanzich agreed that the selling price was $135,000; (4) monthly payment schedules as well as two balloon payment options were included in Exh. D8; and (5) all parties understood that the sale price would be reduced by $45,000 for the BACC licenses and $20,000 for coffee merchandise credits. See Miller v. Pepper, 638 P.2d 864, 866 (Haw. App. 1982)(stating the essential terms as the identification of the parties, a description of the property sold, the price, the time and manner of payment and any other terms in the agreement which are essential to the agreement").

11.  The Court finds Nelson's argument that there was not an Agreement of Sale because Exh. D8 only reflects preliminary negotiations and future negotiations were contemplated to be unconvincing. Shortly after Exh. D8 and the Licensing Agreement were signed, Nelson and Bilanzich began performing in

33

accordance with their oral and written agreement.
Nelson and Cetraro opened two (2) BACC stores in
Montana in the summer of 1997 and began receiving
coffee merchandise credits. Bilanzich began making
payments for the use or towards ownership of the Condo.
Based on the evidence and specifically the conduct of
Nelson, Cetraro, and Bilanzich, the Court finds that
any potential future negotiations were related to
either the date of the balloon payment (Bilanzich was
given two options) or Nelson's payment to the first
mortgage holder and were not material to the Agreement
of Sale going forward. The Court finds it significant
that Nelson and Bilanzich continued to perform pursuant
to the terms of their agreement for approximately one
year. Nelson and Bilanzich, and later Nelson and
Jones, continued to perform in accordance with the
agreement even though no additional paperwork was
prepared and no further discussion regarding the timing
of the balloon payment took place. Accordingly, the
Court finds and concludes that Jones has established

34

the existence and terms of the Agreement of Sale by
clear and convincing evidence.

12.  Regarding the issue of consideration, the
evidence shows that at the time the Agreement of Sale
was formed, there was valid consideration.  Nelson
agreed to transfer ownership and possession of the
Condo to Bilanzich or one of his entities in exchange
for Nelson and Cetraro's obtaining licenses to open and
operate five (5) BACC stores in Montana for a period of
ten (10) years, receive $20,000 in merchandise credits,
and receive additional payments.  At the time the
Agreement of Sale was entered into, the License
Agreement was valid and had value.  Nelson and Jones
were authorized to operate BACC stores without making
any cash payments.  Therefore, the issue is not whether
there was a lack of consideration at the time the
contract was formed, but whether the subsequent failure
or partial failure of the License Agreement renders the
contract unenforceable.

13.  Having found and concluded that there was
an Agreement of Sale between Nelson and Bilanzich, the
Court must determine whether Bilanzich's assignment of
his interest in the Condo to Jones was valid.

14.  At the outset, Nelson and Bilanzich never
agreed to either prohibit or permit assignment.  While
there is disagreement as to whether Nelson accepted
Bilanzich's assignment to Jones, the evidence shows
that Nelson began accepting monthly payments from Jones
in June 1998 and continued to operate BACC stores
pursuant to the Licensing Agreement after Bilanzich's
assignment to Jones.

15.  The Restatement (Second) of Contracts §
317 (1981) states in pertinent part that a contractual
right can be assigned unless "the substitution of a
right of the assignee for the right of the assignor
would materially change the duty of the obligor, or
materially increase the burden or risk imposed on him
by his contract, or materially impair his chance of

obtaining return performance, or materially reduce its value to him."

16. It is likely that Bilanzich's assignment to Jones increased the risk to Nelson because Bilanzich's incentive to honor the License Agreement was diminished. The evidence shows that Jones paid Bilanzich $50,000 for the assignment. However, the Court finds that the assignment is nevertheless valid because Nelson did not object and consented to the assignment through her actions.

17. On June 3, 1998, Jones sent a letter to Nelson and Cetraro informing them that Bilanzich had assigned his interest in the Condo to Jones. Nelson did not object to the assignment, began to accept monthly payments from Jones, gave Jones possession of the Condo, and communicated with Jones' representative, Jean Hammond, about payments due and owing.

18. Accordingly, the Court finds and concludes that, as a result of Bilanzich's assignment to Jones

discussed herein above, there was an Agreement of Sale between Nelson and Jones.

19.   The second issue on remand is whether the Agreement of Sale is enforceable.  A contract for the sale of real property may be deemed unenforceable (1) when it fails to comply with the Statute of Frauds; (2) due to a failure of condition precedent; (3) due to a failure of consideration; or (4) due to a material breach of the contract by one of the parties.  The Court finds and concludes that the contract for the sale of the Condo is not enforceable due to a partial failure of consideration that defeated the object or purpose of the Agreement of Sale.

20.   Pursuant to the Hawaii Statute of Frauds, Hawaii Revised Statute ("HRS") § 656-1, an agreement for the purchase and sale of real property must be in writing and signed by the party to be bound thereby in order to be enforceable. See HRS § 656-1.

21.   "An agreement of sale of land which contains complete and certain essential terms is a

38

valid and enforceable contract if the facts indicate
that the parties at the time it was entered into had no
expectation of further provisions to be negotiated
later.  Essential terms are the identification of the
parties, a description of the property sold, the
prices, the time and manner of payment and any other
terms in the agreement which are essential to the
agreement." Miller, 638 P.2d at 866 (citation omitted).

22.  In Hawaii, "[a] party seeking to establish
a parol contract to convey real property must prove its
existence and its terms by clear and convincing
evidence." Boteilho, 564 P.2d at 146.

23.  Once an oral contract is clearly and
convincingly established, the removal of the contract
from the Statute of Frauds by its part performance must
also be proven by clear and convincing evidence.
Shannon v. Waterhouse, 563 P.2d 391, 394 (Haw. 1977);
Rossiter v. Rossiter, 666 P.2d 617, 621 (Haw. App.
1983).

24.   "Part performance has long been recognized
in Hawaii as an equitable doctrine justifying the
enforcement of an oral agreement for the conveyance of
an interest in land where there has been substantial
reliance by the party seeking to enforce the contract."
McIntosh v. Murphy, 469 P.2d 177, 180 (1970).  In
addition, "[t]he acts constituting part performance
must be pursuant to the contract, with the knowledge
and consent of the other party, and must be such that
to allow the other party to repudiate would be a fraud
upon the plaintiff." Perreira v. Perreira, 447 P.2d
667, 668 (Haw. 1968); see, e.g., Lee v. Kimura, 634
P.2d 1043, 1048 (Haw. App. 1981)(the performance of
lessees in making substantial repairs to the property,
paying the rent and taxes and collecting rental income
and relying upon an oral agreement takes the case out
of the statute of frauds).

25.   The Court has already concluded that Jones
has demonstrated the existence of an Agreement of Sale
by clear and convincing evidence.   The Court similarly

40

finds and concludes that Jones has established by clear and convincing evidence that the removal of the Agreement of Sale from the Hawaii Statute of Frauds is justified due to part performance.

26. It is undisputed that Nelson and Jones opened two BACC stores in Montana which they operated for approximately two and one-half years and obtained $5,000 in coffee merchandise credits. It is also undisputed that Bilanzich and Jones made monthly payments (although sporadic at times) to Nelson. The evidence shows that Bilanzich and Jones made a total of approximately 51 payments to Nelson. After Jones assumed Bilanzich's contract, the parties continued to act in a manner wholly consistent with the Agreement of Sale. Notably, a portion of the monthly payment, $629.81, is the same as that which is reflected on the amortization schedule attached to Exh. D8. With the exception of the sporadic monthly payments, Bilanzich, Jones, Nelson, and Cetraro all performed in accordance with the terms of their agreement for approximately two

and one-half years.  The Court finds and concludes that
Jones has established by clear and convincing evidence
that the part performance of Bilanzich, Jones, Nelson
and Cetraro removes the Agreement of Sale from the
Statute of Frauds.

27.  A contract may also be unenforceable where
there is a failure of a condition precedent. <u>See</u>
<u>Handlye v. Ching</u>, 627 P.2d 1132, 1135 (Haw. App.
1981)("a condition precedent to an obligation to
perform a contract calls for the performance of some
act or the happening of some event after a contract is
entered into, upon the performance or happening of
which the obligation to perform immediately is made to
depend...")(citing 17 Am. Jur. 2d Contracts s 321
(1964)).

28.  Here, the Court finds that Nelson has
failed to establish by a preponderance of the evidence
that the use of the five (5) BACC licenses for ten (10)
years and the receipt of coffee merchandise credits was
a condition precedent to the sale of the Condo going

forward.  While Nelson and Cetraro testified that this
was their understanding, other evidence proves the
contrary.  First, Exh. D8 shows that Bilanzich had the
option to make a balloon payment in November 1999.
Exh. D8 states that "if pay balloon plus balance
receive title plus fee simple signed."  Therefore, the
Court finds that the Agreement of Sale gave Bilanzich
the option to receive title to the Condo as early as
November 30, 1999, long before the ten-year term of the
License Agreement was set to expire.  Second, the
evidence also shows that Cetraro was given the option
of selling the BACC licenses to other individuals.
Therefore, if Cetraro opted to sell all of the
licenses, he and Nelson could have realized the benefit
of the License Agreement before the ten-year period
expired.  Third, the evidence shows that Cetraro only
received $5,000 in merchandise credits and had
difficulty redeeming credits.  Yet, at no time did
Nelson try to cancel the Agreement of Sale due to
Cetraro's difficulty in redeeming coffee merchandise

43

credits.  Accordingly, Nelson has failed to show by a preponderance of evidence that the sale of the Condo was expressly and unequivocally conditioned on Nelson and Cetraro's ability to operate five (5) BACC stores for ten (10) years and obtaining $20,000 in coffee merchandise credits.

29.  A contract will also be unenforceable where there is a total failure of consideration, or, under some circumstances, a partial failure of consideration.  Corbin on Contracts clarifies the distinction between lack of consideration and failure of consideration: "[w]hen a promise is given by one party to another, without anything being bargained for or given in exchange for it, the promise is without consideration...Failure of consideration means 'that a performance for which the promisor bargained has not been rendered * * *.'" Nault v. Smith, 14 Cal. Rptr. 889 (Cal. App. 1961) (citing 1 Corbin on Contracts (1950), § 133, pp. 414, 415).  In other words, failure of consideration "includes instances where a proper

44

contract was entered into when the agreement was made, but because of supervening events, the promised performance fails, rendering the contract unenforceable." World Wide Lease, Inc. V. Woodworth, 728 P.2d 769, 773 (Idaho App. 1986)(citations omitted).

30.  An action based upon failure of consideration for the recovery of money paid on a contract is, in effect, an action for rescission. See Azer v. Myers,793 P.2d 1189, 1218 (Haw. App. 1990), reversed on other grounds; see also Krause v. Mariotto, 406 P.2d 16 (Wash. 1965)(a failure of consideration supports the remedy of rescission of the contract).

31.  However, inadequacy of the value of consideration or partial failure of consideration will not typically invalidate a contract. See Lindsay v. Sorona Gold Min. & Mill Co., 196 S.W. 764, 768 (Mo. 1917)(finding that consideration must be of no value in order to rescind contract based on failure of

consideration); <u>Harllee v. Harllee</u>, 565 S.E.2d 678, 683 (N.C. App. 2002)(stating that inadequate consideration is not sufficient grounds to invalidate a contract).

      32.  The Court finds that Nelson has failed to establish by a preponderance of the evidence that there was a total failure of consideration.  There is no dispute that Nelson and Cetraro operated BACC stores in Montana for approximately two and one-half years and received approximately $5,000 in coffee merchandise credits.  In addition, there is no dispute that Nelson and Cetraro received approximately 51 payments from Bilanzich and Jones.  Presumably, Nelson used the monthly payments she received to pay her debt and mortgage on the Condo.  There is no evidence as to whether Nelson and Cetraro obtained any profit as a result of operating BACC stores.  Under the facts presented in this case, the Court finds and concludes that Nelson has failed to establish by a preponderance of evidence that she received no value in exchange for her promise to sell her condominium resulting in a

total failure of consideration.  However, the Court
finds that Nelson has established by a preponderance of
the evidence that there was a partial failure of
consideration in this case that defeated the object of
the Agreement of Sale.

33.  "A partial failure of consideration occurs
when an individual does not deliver a portion of his
promised performance." <u>Zemco Mfg., Inc. v. Navistar
Intern. Transp. Corp.</u>, 270 F.3d 1117, 1125 (7th Cir.
2001)(citations omitted).  Partial failure of
consideration avoids a contract only "pro tanto", or
only to that extent. <u>See</u> <u>Goo Wan Hoy v. McKeque</u>, 24
Haw. 263 (Haw. Terr. 1918). "Where a partial failure of
consideration has occurred the proper remedy is to
grant appropriate damages to the non-breaching party."
<u>Check Control, Inc. v. Shepard</u>, 462 N.W. 2d 644, 647
(N.D. 1990)(citations omitted).

34.  However, where a partial failure of
consideration goes to the root of the contract or
defeats the purpose of the contract, it may serve as a

ground for rescission. <u>See</u> 17 Am. Jur. 2d. Contracts §
650 (2007); <u>U.S. v. Schaeffer</u>, 319 F.2d 907, 911 (9th
Cir. 1963)(while "[a] partial failure of consideration
does not excuse performance by the other party to a
contract or give him a right of rescission" it may
serve as a "ground for abatement of damages *unless it
goes to the root of the contract*")(emphasis added);
<u>Pickens County v. National Sur. Co.</u>, 13 F.2d 758, 762
(C.C.A. 4th Cir. 1926)("[b]efore partial failure of
performance of one party will excuse the other from
performing his contract, or give him a right of
rescission, the act failed to be performed must go to
the root of the contract"); <u>Bonner v. Oklahoma Rock
Corp.</u>, 863 P.2d 1176, 1186 (Okl. 1993)("the court must
determine whether the called-for performance which has
failed to occur is so important that the contract would
not have been made without it.  In short, *the test is
whether the failure of performance defeats the object
of the contract*")(emphasis in original); <u>see also</u>
<u>Bishop Trust Co., Ltd. V. Kamokila Development Corp.</u>,

48

555 P.2d 1193, 1196 (Haw. 1976)(stating that "the right of restitution exists where the non-performing party has committed a 'material', or a 'total' or a 'vital' breach of the contract which goes to its 'essence'" and finding cancellation of a deed and restitution of property given an appropriate remedy for the non-breaching party).

35.  At the outset, the Court notes that the nonfulfillment of the Licensing Agreement was not due to the fault of Nelson or Jones.  Bilanzich's assignment of the contract to Jones and the subsequent bankruptcy filing by Royal Aloha placed both parties in an unanticipated and undesirable situation.  In considering the essence, object, and root of the Agreement of Sale and the intentions of Nelson and Bilanzich, the Court finds that when the License Agreement was rejected and invalidated after only approximately two and one-half years, the object of the Agreement of Sale was essentially defeated. Significantly, the value of the Licensing Agreement and

the BACC merchandise credits comprised a total of
$65,000, or nearly one-half, of the agreed upon
purchase price of $135,000.  Further, Nelson testified
convincingly that the reason she allowed Bilanzich and
Jones to retain possession of the Condo despite their
sporadic payments over time was that she wanted to
continue to operate BACC stores.  Therefore, the Court
finds and concludes that fulfillment of the License
Agreement was the object, essence and root of the
Agreement of Sale and Nelson is entitled to rescission
due to a partial failure of consideration under the
circumstances presented in this case.

36.  Having found and concluded that Nelson is
entitled to rescission of the Agreement of Sale based
on a partial failure of consideration, the Court need
not reach the issue of whether Nelson or Jones breached
the Agreement of Sale.

37.  Rescission is an equitable remedy. <u>Almeida
v. Almeida</u>, 669 P.2d 174, 181 (Haw. 1983).  The effect
of rescission is to nullify the Agreement of Sale. <u>See</u>

Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment,189
F.3d 1017, 1031 (9th Cir. 1999)("[u]nder true
rescission, the plaintiff returns to the defendant the
subject of the transaction, plus any other benefit
received under the contract, and the defendant returns
to the plaintiff the consideration furnished, plus
interest")(citations omitted).  In other words, the
parties should be returned to the positions they
occupied before they entered into the Agreement of
Sale. See Cox v. Zale Delaware, Inc., 239 F.3d 910, 914
(7th Cir. 2001)("[w]hen a contract is rescinded, the
parties have to be put back to where they were before
the contract was made, more precisely to where they
would have been had they not made the contract in the
first place"); Patch v. Arsenault, 653 A.2d 1079, 1082
(N.H. 1995)("[i]n contrast to damages, equitable
rescission and restitution is a complete remedy which
restores the injured party to the position occupied
before the transaction"); Federal Land Bank of Wichita
v. Krug, 856 P.2d 111, 115 (Kan. 1993)(stating that

upon rescission of a contract the parties must be placed in substantially the same condition as they were when the contract was executed); <u>EarthInfo</u>, 900 P.2d at 118 ("[r]escission of a contract normally is accompanied by restitution on both sides").

38.   Therefore, the Court must try to restore the parties to the positions they occupied prior to entering into the Agreement of Sale.  Prior to the Agreement of Sale, Nelson and Cetraro did not have the right or opportunity to operate BACC stores in Montana, and Bilanzich and Jones did not have possession of the Condo or an interest in the Condo.  The Court finds and concludes that Nelson and Jones are generally now in the same positions, respectively, as each of them occupied prior to the Agreement of Sale.

39.   Nelson testified that prior to September 1997, she rented the Condo for $1,500/month.  After entering into the Agreement of Sale, Nelson collected payments of approximately $1,100/month from Bilanzich

or Jones.[7]  Based on the evidence, the Court finds that
the payments made by Bilanzich and later by Jones to
Nelson under the Agreement of Sale should be construed
and treated as rent or payment for the benefit of
possession and use of the Condo by Bilanzich and Jones
during the relevant time period.

        40.  Jones testified that he sent Nelson and
Cetraro a check in the amount of $7,000 in January 2000
to facilitate transfer of title to the Condo.  Cetraro
cashed this check approximately one month later.  It is
undisputed that the $7,000 was a debt owed by Bilanzich
to Nelson under the Agreement of Sale.  Nelson
testified that her invoices to Jones and accounting of
payments made by Jones did not include the $7,000 debt
accrued by Bilanzich.  Because title to the Condo was
never transferred to Jones, in order to restore the
parties to essentially the same positions they occupied
prior to the Agreement of Sale, the Court finds that
Nelson should disgorge and pay Jones $7,000.

_____

        [7]  The monthly payments fluctuated depending on
utilities, etc.

53

Accordingly, the Court finds and concludes that Jones
is entitled to recover the sum of $7,000 from Nelson.

41.    Finally, based on the evidence, the Court
cannot say that the BACC stores opened in Montana by
Nelson and Jones pursuant to the License Agreement were
profitable or operated at a loss during their
existence.  Therefore, the Court declines to address
the issue of whether any payment arising from or
related to the BACC stores in Montana should be made or
received by any party upon rescission of the Agreement
of Sale.

42.    The third issue on remand is who has the
right to possession and ownership of the Condo.  Having
found that Nelson is entitled to rescission of the
Agreement of Sale due to the partial failure of
consideration that defeated the object of the Agreement
of Sale, the Court finds and concludes that Nelson is
entitled to possession and ownership of the Condo.

43.    Based on the foregoing, the Court finds
and concludes that Nelson is entitled to judgment in

54

her favor as to Count I (summary possession) and Count
II (declaratory relief) of the Complaint.  However,
Jones is entitled to recover the amount of $7,000 from
Nelson as stated herein above.

44.  Based on the foregoing, the Court finds
and concludes that Nelson is also entitled to judgment
in her favor as to Count II (breach of contract) and
Count V (declaratory relief) of Jones' Second Amended
Counterclaim.

45.  The Court finds and concludes that Count
III (breach of contract for specific performance) is
rendered moot as a result of the sale of the Condo to
an unrelated party during the pendency of this action.

46.  Pursuant to these Findings of Fact and
Conclusions of Law stated herein, the Court hereby
orders that judgment be entered in favor of Nelson and
against Jones.

IT IS SO ORDERED.

Dated: Honolulu, Hawaii, August 31, 2007.





Kevin S.C. Chang
United States Magistrate Judge

CIVIL NO. 01-00182 KSC; NELSON V.JONES; FINDINGS OF FACT AND CONCLUSIONS OF LAW